UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRUCE PURSE,

                              Plaintiff,

              v.

MOUNT VERNON CITY SCHOOL
DISTRICT,

                              Defendant.

No. 17-CV-8565 (KMK)

OPINION & ORDER

Appearances:

Robert S. Powers, Esq.
Law Office of Robert S. Powers
North Babylon, NY
*Counsel for Plaintiff*

Gerald S. Smith, Jr., Esq.
Joshua M. Goldstein, Esq.
Silverman and Associates
White Plains, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Plaintiff Bruce Purse ("Plaintiff") brings this Action, pursuant to the Americans with Disabilities Act ("ADA"), against Mount Vernon City School District ("Defendant," or the "District"). (*See* Compl. (Dkt. No. 1).) Plaintiff claims that Defendant violated his rights under the ADA when it failed to provide him with a reasonable accommodation and failed to engage in an interactive process, and when it altered the terms and conditions of his employment and forced him to resign on the basis of his disability. (*Id.* ¶¶ 28–33.)

Before the Court is a Motion for Summary Judgment (the "Motion") submitted by Defendant. (*See* Def.'s Not. of Mot. ("Not. of Mot.") (Dkt. No. 32).) For the reasons explained herein, the Motion is granted.

## I. Background

### A. Factual Background

The following facts are taken from Defendant's statement pursuant to Local Civil Rule 56.1, (Def.'s Local Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 34)), Plaintiff's response to that statement, (Pl.'s Resp. to Def.'s 56.1 ("Pl.'s 56.1") (Dkt. No. 39)), and the admissible evidence submitted by the Parties.[1] The Court recounts only those facts necessary for consideration of the instant Motion.

#### 1. Plaintiff's Background

Effective September 1, 2007, Plaintiff was hired as a probationary music teacher in the District. (Def.'s 56.1 ¶ 1 (citing Decl. of Gerald S. Smith, Esq. ("Smith Decl.") Exs. C ("Aug. 3, 2007 Dunn Letter"); E ("Pl.'s Dep. Tr."), at 5–7 (Dkt. Nos. 35, 35-3, 35-5)).) Plaintiff was assigned to Thornton High School ("Thornton"), but also taught at Pennington Elementary

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *Id.* at 56.1(b). "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). Where possible, the Court relies on the facts as presented in the Parties' statements of fact. However, direct citations to the record are used where the Parties' statements of fact do not include relevant facts or do not accurately characterize the record.

School ("Pennington") for about a year.  (*Id.* ¶ 3 (citing Pl.'s Dep. Tr. 6); Pl.'s Dep. Tr. 6.)  On December 2, 2009, Plaintiff was appointed to a full-time position as a music teacher at Thornton. (Def.'s 56.1 ¶ 2 (citing Smith Decl. Ex. D ("Dec. 3, 2009 Jackson Letter") (Dkt. No. 35-4).)  According to Plaintiff, he had to pass a physical examination to teach in the District and was "not sick at all" before he began working there.  (Pl.'s Dep. Tr. 29–30.)

On average, Plaintiff worked from 7:50 a.m. to 5:00 or 6:00 p.m.  However, he occasionally worked as late as 8:00 or 9:00 p.m.  (Def.'s 56.1 ¶ 6 (citing Pl.'s Dep. Tr. 13–14).)  In his position, Plaintiff often played instruments to demonstrate musical concepts for his students, including after school.  (*Id.* ¶ 4 (citing Pl.'s Dep. Tr. 9, 11).)  In Plaintiff's opinion, playing musical instruments was "fundamental" to his teaching responsibilities.  (*Id.* ¶ 5 (citing Pl.'s Dep. Tr. 11).)  At Thornton, Plaintiff initially taught in Room LL-01 (the "Band Room"), which was located on the first floor of the building.  (*Id.* ¶ 7 (citing Smith Decl. Ex. F ("Bradley Dep. Tr."), at 15–16 (Dkt. No. 35-6)).)  The Band Room sometimes experienced flooding from rainstorms.  (*Id.* ¶ 8 (citing Bradley Dep. Tr. 15–16).)  When flooding occurred, Plaintiff was moved to another classroom pursuant to a schedule that the administration created for such occasions.  (*Id.*)

### 2.  Transfer Application

In the spring or summer of 2015, Plaintiff applied to transfer to a position in a different school in the District.  (Decl. of Bruce Purse ("Pl. Decl.") ¶¶ 4–5 (Dkt. No. 37).)[2]  According to

---

[2] Defendant notes in its Reply that the documents attached to Plaintiff's Declaration as Exhibits A and B were not previously identified or produced to Defendant, and points out certain inconsistencies throughout the document and Plaintiff's Declaration.  (Def.'s Reply in Supp. of Mot. ("Def.'s Reply") 4 n.1 (Dkt. No. 40).)  Although the Court considers Plaintiff's Declaration and these documents herein, the documents attached to Plaintiff's Declaration are not dispositive to the Court's resolution of the Motion.

Plaintiff, at that time, he was "aware that the school building in which [he] was working was detrimental to [his] health," and although he did not know the cause of the problem, he "certainly suspected that the mold in the school building was an issue." (*Id.* ¶ 4.) At the same time as Plaintiff's transfer application, he spoke to Thornton Principal Sharon Bradley ("Bradley") about the Band Room, and she told Plaintiff that she would "work on fixing the water problem in [his] classroom." (*Id.*) Plaintiff avers that he did "not couch[]" his transfer request "in terms of [his] medical condition," and "did not wish to put [his] medical issues and the condition of the building in play." (*Id.* ¶¶ 4, 6.)

Evelyn Collins ("Collins"), the Head of Arts for the District, processed Plaintiff's transfer application. (*Id.* ¶ 5.) Plaintiff told Collins "of [his] issues at Thornton," and Collins told him that there was a music teacher position open at Graham Elementary School ("Graham"). (*Id.*)[3] Plaintiff met with the principal of Graham, who said that he would be happy to have Plaintiff teach music at the school, and met with Collins again in June 2015, who told Plaintiff that his move to Graham was approved. (*Id.*)[4] However, on June 15, 2015, Plaintiff was informed via letter that his request for transfer was not approved "based on [his] interview," although Plaintiff states in his Declaration that he was rejected "by reason of a meeting of the principal's committee for the [s]chool [d]istrict." (*Id.* ¶ 5; *id.* Ex. B ("June 15, 2015 Gagne Kerpiewski Letter") (Dkt. No. 37-1).)

Plaintiff also notes that "several years prior" to his 2015 transfer application, the District "attempted to terminate [him] as a result of [his] medical condition." (Pl.'s Decl. ¶ 6.) Plaintiff

---

[3] Plaintiff's application to transfer states that he applied to a position at "Columbus or Mandela High." (Pl. Decl. Ex. A ("Apr. 5, 2015 Appl.") (Dkt. No. 37-1).)

[4] Plaintiff does not submit direct evidence that supports the alleged statements made by Collins and the principal, which therefore appear to be inadmissible hearsay.

states that an attorney helped him to obtain tenure and remain at Thornton.  (*Id.*)  Bradley also referenced "a time where [Thornton] w[as] asking not to renew [Plaintiff]" during her deposition, noting that she recommended that Plaintiff not return because "[t]he level of work was[] [not] to the standard that [Bradley] thought was best for the students."  (Bradley Dep. Tr. 13–14.) According to Bradley, this decision was unrelated to Plaintiff's health.  (*Id.* at 14.)

### 3.  Meetings with Thornton Administration

According to Plaintiff, the first time he spoke to Bradley about mold in the Band Room "could have been as early as 2013, but it[] [was] definitely 2014."  (Pl.'s Dep. Tr. 28.)[5]  Plaintiff does not have records of these early conversations with Bradley, though he remembers showing her the alleged mold in his classroom, and Bradley responding that she would have the custodian look at it because she was not qualified to know what it was.  (Smith Decl. Ex. T ("Pl.'s Hr'g Tr."), at DEF 318–19 (Dkt. No. 35-20).)  He also recalled that the custodians knew about the mold at this time and that they reported it to Bradley and the "Building and Grounds head."  (*Id.* at DEF 317–18.)  Although Buildings and Grounds personnel ("Buildings and Grounds") removed carpeting from the Band Room early on, Plaintiff testified that the mold started to grow in the practice rooms and storage room, which he constantly went into, and recalled that he discovered mold in "a few different places in his classroom" in June 2015.  (*Id.* at DEF 316; Pl.'s Dep. Tr. 28–29.)  Plaintiff also thought that Thornton was supposed to "ameliorate the situation [after] the initial mold conversation" he had with Bradley in August 2014, but that this amelioration never took place, and when he returned to Thornton in September 2014, the Band Room had been "festering at the time."  (*Id.* at 27–28.)  Plaintiff later told his pulmonary

---

[5] At a later point in his deposition, Plaintiff claimed that the state of his health "sometimes" affects his memory and "being totally exact is not easy" for him.  (Pl.'s Dep. Tr. 46–47.)

specialist, Dr. Irene Grant ("Dr. Grant"), that black mold was found in his classroom in 2015. (Smith Decl. Ex. U ("Grant's Hr'g Tr."), at DEF 293 (Dkt. No. 35-21).) Plaintiff states that during the summer of 2015, his respiratory condition improved, but when he returned to Thornton in September 2015, his condition again immediately worsened. (Pl. Decl. ¶ 5.) However, Plaintiff did not recall telling Bradley that he was sick until their October 2015 meeting, although he also testified that Bradley had been "abreast . . . [of] a time [he] was sick before," but they "did not have all the answers for what was making [him] sick." (Pl.'s Dep. Tr. 28, 30, 33.)

On October 13, 2015 at 2:20 p.m., Plaintiff sent an email to Bradley and copied Michael Baldino ("Baldino"), the union's OSHA representative. (Def.'s 56.1 ¶ 9 (citing Pl.'s Dep. Tr. 31; Smith Decl. Ex. G ("Oct. 13, 2015 Bradley Email") (Dkt. No. 35-7)).) Plaintiff requested a meeting to discuss "the perspective [sic] mold in the room and it's [sic] cleanup along with how it affects [his] health and [his] doctor's results as a consequence of [his] recent respiratory illness." (*Id.* ¶ 10 (citing Oct. 13, 2015 Bradley Email).) Bradley responded on October 13 at 3:25 p.m. that she would find a time to meet with Plaintiff, and copied several individuals, including a union representative, the Head of Buildings and Grounds, and the Acting Head Custodian. (*Id.* ¶¶ 11–12 (citing Pl.'s Dep. Tr. 35–36; Oct. 13, 2015 Bradley Email).) Bradley also wrote that "the substance in [the Band R]oom does have an appearance of something that looks like mold," but that they would need to test the substance to be sure. (*Id.* ¶ 14 (citing Pl.'s Dep. Tr. 36; Oct. 13, 2015 Bradley Email).) She stated that Buildings and Grounds had worked on "areas that had challenges," including the Band Room, over the previous weekend, and that the school would perform an air quality test that week, the date of which Bradley would tell Plaintiff at their meeting. (Oct. 13, 2015 Bradley Email.) Although Plaintiff testified that he

could not "say that they did or did not [clean the Band Room] on that weekend . . .[,] [i]t took them weeks to even try to remediate the situation." (Pl.'s Dep. Tr. 54.) In addition to sending this email, Bradley requested that members of Buildings and Grounds check the Band Room, and was informed that this area was already being worked on. (Def.'s 56.1 ¶ 13 (citing Bradley Dep. Tr. 33–34).)

On October 14, 2015, Plaintiff met with Bradley. (*Id.* ¶ 16 (citing Smith Decl. Ex. H ("Oct. 22, 2015 Bradley Mem.") (Dkt. No. 35-8); Pl.'s Dep. Tr. 58–59).)[6] During this meeting, Plaintiff told Bradley that he believed that the mold in the Band Room had contributed to his respiratory infection and gave Bradley two letters from his physician, Dr. Joseph Casino ("Dr. Casino"). (*Id.* ¶¶ 17–18 (citing Pl.'s Dep. Tr. 58–59; Oct. 22, 2015 Bradley Mem.).)[7] The first letter from Dr. Casino, dated August 31, 2015, stated that Plaintiff had "a history of heart and lung disease," and had been "complaining of cough and shortness of breath [that] appear[ed] to be exacerbated when he [wa]s exposed to mold." (Smith Decl. Ex. J ("Aug. 31, 2015 Dr. Casino Letter") (Dkt. No. 35-10).) The letter further stated that Plaintiff had documented "standing water" and "visible mold on the walls" in his classroom, and that while he was not teaching over the summer, his symptoms "improved significantly." (*Id.*) However, upon returning to Thornton, there had been "no change in the standing water or mold." (*Id.*) Dr. Casino instructed

---

[6] Plaintiff and Bradley were originally scheduled to meet on the morning of October 15, 2015, but on October 14, Plaintiff approached Bradley when he arrived at work, pointed his finger at her, and said that he needed to talk to her "right now . . . no union rep—just you and I, now." (Oct. 22, 2015 Bradley Mem. 1.) Bradley agreed to speak and took Plaintiff to her conference room. (*Id.*) Plaintiff disputes that he pointed his finger at Bradley. (Pl.'s Dep. Tr. 65.)
Plaintiff testified that he spoke to Bradley on October 5, but he appears to have been referring to their October 14 conversation. (Pl.'s Hr'g Tr. DEF 321.)

[7] Plaintiff previously testified that he first saw Dr. Friedman, his "primary doctor," and then was recommended to see Dr. Casino, a "pulmonologist." (Pl.'s Hr'g Tr. DEF 315.)

that "repeated exposure to mold spores can precipitate illness in individuals who are susceptible." (*Id.*) He recommended that the "environment be cleaned extensively and professionally," or, in the alternative, that Plaintiff be relocated to "an alternative site in the building" free of such issues. (*Id.*) Plaintiff believes that he previously provided this letter to Bradley in August 2015, and that between the time he gave her the letter and the October 14 meeting, he was permitted to teach in alternative classrooms when he felt uncomfortable teaching in the Band Room. (Def.'s 56.1 ¶¶ 20–21 (citing Pl.'s Dep. Tr. 50–51, 55); Pl.'s Dep. Tr. 53.)

The second letter from Dr. Casino was dated October 12, 2015. (Smith Decl. Ex. K ("Oct. 12, 2015 Dr. Casino Letter") (Dkt. No. 35-11).) This letter stated that Dr. Casino "recently examined" Plaintiff, that Plaintiff's condition had not improved, and that a test conducted on Plaintiff in September 2015 had found "positive antibody titers to mold." (*Id.*) Dr. Casino "reiterate[d] [his] August 31, 2015 concern" that "ongoing exposure to mold spores" could exacerbate Plaintiff's "existing condition." (*Id.*) Dr. Casino wrote, "It is not advisable that [Plaintiff] continue to be exposed to any live mold or mold spores," and advised that Plaintiff should use a "partial face mask to block [any] particulate matter from being inhaled into his airways." (*Id.*)

Bradley told Plaintiff that he should not return to the Band Room, and that he should instead use the alternative classrooms. Bradley gave him a schedule identifying these classrooms, which listed the same classrooms that Plaintiff previously used "whenever he felt it was necessary." (Def.'s 56.1 ¶¶ 23–24 (citing Pl.'s Dep. Tr. 82–84, 86; Oct. 22, 2015 Bradley Mem.; Smith Decl. Ex. L ("Purse Room Sched.") (Dkt. No. 35-12)).) According to Plaintiff, either Bradley or "Ms. Morales" ("Morales"), the assistant principal, gave him the schedule.

(Pl.'s Dep. Tr. 83, 100.) Plaintiff testified that these rooms did not flood, but that some of them were "prone to leaks . . . through the window" and had inadequate heat. (*Id.* at 85.) However, Plaintiff also testified that there was "no leakage" in these rooms of the type of water that was in the Band Room. (Pl.'s Hr'g Tr. DEF 328.) Although Plaintiff thought that there was a "possibility" of mold on the higher floors, this suspicion was unconfirmed. (Pl.'s Dep. Tr. 113.) Plaintiff also would have preferred to teach in classrooms that were "more conducive to teaching music," (Def.'s 56.1 ¶ 26 (citing Pl.'s Dep. Tr. 150–51)), and thought that the Band Room was "the only place that [he] could teach . . . [m]usic" because of the instruments and SMART board available, (Pl.'s Dep. Tr. 76). Although Plaintiff requested to teach in a large theater room with a stage on the third floor, Bradley gave that room to a different teacher. (*Id.* at 149.) In the alternative classrooms, Plaintiff testified that he "was at a deficit always." (*Id.* at 151.)

Plaintiff also testified that he remained sick in "whatever room he was in," even if it was not the Band Room, (*id.* at 66), and that a "bevy of [employees]" had concerns about the mold at the school, (*id.* at 87). However, at the time of their meeting, Plaintiff did not inform Bradley that he was unable to teach in the alternative classrooms or that the schedule was unacceptable, because he "did not have any basis to say so at that time." (Def.'s 56.1 ¶ 25 (citing Pl.'s Dep. Tr. 86–89).) Plaintiff did state that he told Bradley that he "did go to those rooms initially from her" and that he was "coughing in those rooms [on the third floor] too at that time," though it is unclear from Plaintiff's testimony whether and when he informed Bradley of this fact. (Pl.'s Dep. Tr. 48–49.) Plaintiff later clarified that he found himself coughing the most in Room 2-08, one of the alternative classrooms, which he "would only say . . . to . . . Morales," and that he had coughed in "other parts of the building on the cellar floor," but he "never said" to anyone at Thornton that he was sick in "every room [he went] to." (*Id.* at 87, 91.) According to Bradley,

three to four other rooms in the school suffered from flooding, each of which was on the same level as the Band Room. (Bradley Dep. Tr. 18.)

Plaintiff does not dispute that Bradley granted both of Dr. Casino's recommendations—that Plaintiff be relocated within the building at Thornton and that he be permitted to wear a face mask—although Plaintiff thought that Bradley said that he could wear a mask in the Band Room but "did not say that [he] could wear the mask in the building." (Def.'s 56.1 ¶¶ 47, 49–50 (citing Pl.'s Dep. Tr. 66–68).) At the time, these were the only recommendations presented to Bradley. (*Id.* ¶ 48 (citing Pl.'s Dep. Tr. 67).) Plaintiff also did not feel that it was necessary to wear the face mask throughout the building, so he does not know whether he requested to do so, or whether he only requested to wear the mask when he re-entered his classroom. (*Id.* ¶ 50 (citing Pl.'s Dep. Tr. 67–68).)

At his October 14 meeting with Bradley, Plaintiff asked for permission to speak to Ken Silver ("Silver"), the Assistant Superintendent of the District. Bradley gave Plaintiff permission to do so. (*Id.* ¶ 27 (citing Oct. 22, 2015 Bradley Mem.; Pl's Dep. Tr. 70–71).) During his subsequent meeting with Silver, Plaintiff asked whether his mold concerns could be addressed, such as cleaning or remediating the Band Room.[8] Silver told Plaintiff that the issue was being addressed and referred to the air testing that Thornton was conducting. Plaintiff also raised the possibility of transferring to a different building, which Silver said he would discuss with the Superintendent. (*Id.* ¶¶ 28–29 (citing Pl.'s Dep. Tr. 71–73).) At that time, no medical professional had told Plaintiff that Thornton's building was making him sick, or that it was necessary for his health to transfer elsewhere, but he asked about a transfer because he was

---

[8] According to Plaintiff's deposition testimony, "Mr. Polliccio," the head of Buildings and Grounds, also attended this meeting. (Pl.'s Dep. Tr. 35.)

concerned he "was getting sick from the environment somewhere in the school, whether it was the [B]and [R]oom or in another place of [sic] the school." (*Id.* ¶¶ 31–33 (citing Pl.'s Dep. Tr. 74–75, 77–78).) As such, Plaintiff did not tell Silver that a doctor had informed him that he needed to transfer, and at the time, "didn't have anything to substantiate [his] intuition of what was happening to [him] until [he] got someone to tell [him] exactly what [his] condition was." (*Id.* ¶¶ 32–34 (citing Pl.'s Dep. Tr. 75, 77–78).) Plaintiff also raised the possibility of a transfer because he felt that the administration at Thornton did not sufficiently support the music program, and hoped that a different administration would provide him with more support. (*Id.* ¶ 35 (citing Pl.'s Dep. Tr. 103–05).) Plaintiff asked Silver whether he could speak to the Superintendent, but Silver said that he was not available. (Pl.'s Dep. Tr. 78–79.) According to Plaintiff, Silver called him the following day to say that "they had basically declined" any "concerns that [Plaintiff] had for trying not to be in the environment of the school," and that Plaintiff was to continue working in the alternative classrooms. (Pl.'s Hr'g Tr. DEF 322–23.)

On October 13, 2015, an air quality test was performed in the Band Room and throughout the building. (Def.'s 56.1 ¶ 37 (citing Pl.'s Dep. Tr. 37; Bradley Dep. Tr. 28; Smith Decl. Ex. M ("Oct. 14, 2015 Air Report") (Dkt. No. 35-13)).)[9] According to the air quality test, the mold level in the building was "fairly low," and had mold levels that were "all below . . . outdoor levels." (Smith Decl. Ex. N ("Oct. 15, 2015 Bradley Email"), at 2–3 (Dkt. No. 35-14).) The report concluded that the mold level should therefore not be considered an "environmental concern." (Def.'s 56.1 ¶ 39 (citing Pl.'s Dep. Tr. 37, 39; Oct. 14, 2015 Air Report; Oct. 15, 2015 Bradley Email).) According to Defendant, these results matched the results of an earlier air

---

[9] Defendant's 56.1 Statement says that the test was performed on October 13, 2014. (Def.'s 56.1 ¶ 37.) The Court assumes that this is a typographical error.

quality test performed in the building on October 1, 2014. (*Id.* ¶ 40 (citing Smith Decl. Ex. O ("Oct. 1, 2014 Air Report") (Dkt. No. 35-15)).) The earlier test found that there "were no mold growth-like [sic] observed inside [the] Band Room," and the mold readings inside the building were "well below . . . the threshold level recommended by many industrial hygienists." (*Id.* ¶ 41 (citing Oct. 8, 2015 Air Report DEF 250).) This report concluded that mold was "not a recognized environmental concern in the Band Room." (*Id.*)

On October 15, 2015, Plaintiff met with Bradley and Baldino and received the results of the October 13 air quality test. (*Id.* ¶ 38 (citing Pl.'s Dep. Tr. 37, 47–49, 58–59, 68; Oct. 22, 2015 Bradley Mem.).) Plaintiff did not believe that the test results were accurate because he was "getting sick from something" and "had to seek what that was." (*Id.* ¶ 43 (citing Pl.'s Dep. Tr. 45).) He asked for a second opinion because "there was the appearance of mold in . . . [his] office . . . [and] practice rooms," and because he had smelled mold. (Pl.'s Dep. Tr. 42.) Baldino informed him that the union had previously used the same company for air quality testing, the results were credible, and that the union would not pay for any additional testing. (Def.'s 56.1 ¶ 42 (citing Pl.'s Dep. Tr. 41–42, 79–80; Oct. 22, 2015 Bradley Mem.).)[10] During this meeting, Bradley said that because Plaintiff was not comfortable with teaching in the Band Room, he should not go in there and would instead teach out of the alternative classrooms for the remainder of the school year. (*Id.* ¶ 46 (citing Pl.'s Dep. Tr. 84; Oct. 22, 2015 Bradley Mem.).) Bradley offered to have someone obtain Plaintiff's things from the Band Room, but Plaintiff wanted to go himself. (Pl.'s Dep. Tr. 80–82; Oct. 22, 2015 Bradley Mem. DEF 113.)[11] Plaintiff

---

[10] According to Bradley's letter to Plaintiff, Baldino said that he would "check and see if the union [wa]s willing to pay" for additional air testing. (Oct. 22, 2015 Bradley Mem. 2.)

[11] Plaintiff testified that he asked the custodians to get his possessions, but they did not know exactly what he needed. He said that he "basically had to leave all of [his] years of stuff." (Pl.'s Dep. Tr. 81.)

also informed Bradley that he would wear a mask in the Band Room and that one of the cleaners would help him move his possessions. (Pl.'s Dep. Tr. 81–82; Oct. 22, 2015 Bradley Mem. DEF 113.)

According to Defendant, Plaintiff did not provide a copy of this test to "any person trained in how to test air quality or for mold." (Def.'s 56.1 ¶ 44 (citing Pl.'s Dep. Tr. 70).) However, Plaintiff did provide a copy of the test to Dr. Grant and Dr. Casino. (Pl.'s 56.1 ¶ 44 (citing Pl. Decl. ¶¶ 9–13).) Dr. Casino did not inform Plaintiff that the air quality tests were unreliable. (Def.'s 56.1 ¶ 45 (citing Pl.'s Dep. Tr. 74).) Plaintiff states that when Dr. Grant saw the results, she noted that "the remediation done at the school was not successful." (Pl. Decl. ¶ 13.) In a December 2015 letter to Plaintiff's counsel, Dr. Grant wrote that "[e]nvironmental testing done after remediation documented airborne Aspergillus/Penicillium, Chaetomium[,] and Stachybotrys spores." (*Id.* (citing Pl. Decl. Ex. F ("Dec. 30, 2015 Grant Letter") (Dkt. No. 37-1)).) Dr. Grant explained that "Stachybotrys only proliferates with severe indoor wetness, and usually does not produce airborne spores." (*Id.*) Therefore, "the presence of these airborne spores indicates continued active proliferation," meaning that "the remediation was unsuccessful." (*Id.*) Tests on Plaintiff revealed that the "specific titers" in his body matched spores detected in Thornton's environmental testing. (*Id.*) Plaintiff speculates in his Declaration that the weekend prior to the air test, "professionals scrubbed the walls and floor" so that mold would not be visible to the testing company. (Pl. Decl. ¶ 12 (citing Oct. 13, 2015 Bradley Email; Oct. 14, 2015 Air Report).) Also according to Plaintiff, after the testing was completed, Thornton closed the Band Room, and a "bond issue was approved to remedy the causes of the environmental issues in the building." (*Id.* ¶ 3.) Plaintiff does not elaborate on what this means,

although in his deposition he also testified that there were "bond proposals" to alleviate the problems in the Band Room after he complained about the conditions. (Pl.'s Dep. Tr. 73, 146.)[12]

### 4. Plaintiff's Absences from Work

Once Bradley gave Plaintiff a schedule of alternative classrooms, Plaintiff taught in those rooms for one day. (Def.'s 56.1 ¶ 52 (citing Pl.'s Dep. Tr. 90–91).) After October 15, 2015, however, Plaintiff did not return to work. (*Id.* ¶ 57 (citing Pl.'s Dep. Tr. 57, 59; Oct. 22, 2015 Bradley Mem.).) Plaintiff testified that on his last day, he did not feel well, went to the nurse, and told Bradley that he was sick. (Pl.'s Dep. Tr. 91–93.) Bradley had a custodian escort Plaintiff to his car. (*Id.* at 93.) At that time, Plaintiff intended to return when he felt better, and, according to Defendant, he did not tell Bradley that he would be unable to return. (Def.'s 56.1 ¶¶ 53–54 (citing Pl.'s Dep. Tr. 21–23, 92).)[13] Plaintiff's "situation deteriorated," and he subsequently saw Dr. Casino, who informed him that he should consult with a specialist. (Pl.'s Dep. Tr. 93.) Dr. Casino did not recommend that Plaintiff should stay out of work until he had a consultation, and Plaintiff believed that he would come back to work when he felt better. (Def.'s 56.1 ¶¶ 55–56 (citing Pl.'s Dep. Tr. 92–94).)

---

[12] Plaintiff does not provide a basis for his knowledge that a bond issue had been approved to the remedy the "environmental issues" in the building, and also does not identify evidence substantiating that "professionals" scrubbed the walls and floor of the building prior to the air quality testing.

[13] Plaintiff denies that he did not tell Bradley that he would not return until the building was properly cleaned when he departed in October. (Pl.'s 56.1 ¶ 54 (citing Pl. Decl. ¶ 8).) However, this is not an accurate characterization of the portion of the Declaration cited by Plaintiff, which relates to the District's claims that Plaintiff's physical condition precluded him from working after 2015. (Pl. Decl. ¶ 8.)

On October 22, 2015, Plaintiff received a memorandum from Bradley summarizing their earlier meetings and attaching a copy of the letters from Dr. Casino, Plaintiff's schedule of alternative classrooms, and the air testing results. (*Id.* ¶ 58 (citing Pl.'s Dep. Tr. 58–59; Oct. 22, 2015 Bradley Mem.).) Bradley also sent a copy of this memorandum and the attachments to the District Office, but she is not sure when it was received by the Office. (*Id.* ¶ 59 (citing Bradley Dep. Tr. 36–37).) Bradley's letter stated that at the conclusion of Plaintiff's October 15 meeting with Bradley and Baldino, they "all agreed" that Plaintiff would not return to the Band Room. (Oct. 22, 2015 Bradley Mem. DEF 113.)

On October 23, 2015, Plaintiff received a letter from Assistant Superintendent Denise Gagne-Kurpiewski ("Gagne-Kurpiewski"). (Def.'s 56.1 ¶ 60 (citing Pl.'s Dep. Tr. 89; Smith Decl. Ex. P ("Oct. 23, 2015 Gagne-Kerpiewski Letter") (Dkt. No. 35-16)).) The letter stated that the District had not received documentation that Plaintiff could not report to work, and therefore expected him to do so. (*Id.* ¶ 61 (citing Pl.'s Dep. Tr. 89–90; Oct. 23, 2015 Gagne-Kerpiewski Letter).) Plaintiff testified that he recalled providing the District with documents about his absence during this period. (Pl.'s Dep. Tr. 95.)

Shortly after October 23, 2015, Plaintiff received a letter from Dr. Grant, which Plaintiff delivered to Beverly Morris ("Morris") in the District's Human Resources Department ("Human Resources") on October 29, 2015. (Def.'s 56.1 ¶¶ 63–64 (citing Pl.'s Dep. Tr. 109–10; Smith Decl. Ex. Q ("Oct. 23, 2015 Grant Letter") (Dkt. No. 35-17)).) Plaintiff recalled that he saw Dr. Grant at least three times before she sent this letter, and his first appointment would have been within the three-week period before he received it, (Pl.'s Dep. Tr. 111–12), but Dr. Grant testified that she saw Plaintiff for the first time on October 23, 2015, (Grant's Hr'g Tr. DEF 292). Dr. Grant wrote that Defendant suffered from "restrictive lung disease" exacerbated by

"re-exposures" to "heavy chronic visible environmental microbial exposure" at his job. (Oct. 23, 2015 Grant Letter.) Dr. Grant recommended that Plaintiff avoid returning to Thornton until it was remediated by a "qualified environmental remediator" and "reevaluated by a certified indoor environmentalist and microbial investigator." (Def.'s 56.1 ¶ 65 (citing Pl.'s Dep. Tr. 112; Oct. 23, 2015 Grant Letter).) Dr. Grant said that any re-exposure would risk aggravating Plaintiff's condition and jeopardizing his health. (Oct. 23, 2015 Grant Letter.) Plaintiff interpreted this letter to mean that any area of Thornton that "possibly contained mold needed to be remediated, including the third floor." (Def.'s 56.1 ¶ 66 (citing Pl.'s Dep. Tr. 112–13).) Plaintiff also believed that until this remediation was completed, it was not safe for him to return to Thornton. (*Id.* ¶ 67 (citing Pl.'s Dep. Tr. 114, 116).) According to Plaintiff, Dr. Grant also believed that this was the case, and she thought that Thornton would be a "medical risk" until it was "proven to be free of hazardous molds," and that the building still needed more extensive testing. (Pl.'s 56.1 ¶¶ 66–67 (citing Pl. Decl. ¶¶ 9–10 (citing Grant's Hr'g Tr. DEF 297–99)).) According to Defendant and Plaintiff's deposition testimony, Dr. Grant also told him that he was restricted from working anywhere else when she first advised him not to return to work at Thornton. (Def.'s 56.1 ¶¶ 68, 81 (citing Pl.'s Dep. Tr. 132).) However, Plaintiff now contends that Dr. Grant only informed him not to work in the building at Thornton. (Pl.'s 56.1 ¶¶ 68, 81 (citing Pl. Decl. ¶ 10 (citing Grant's Hr'g Tr. DEF 300)).)

On October 28, 2015, the day before Plaintiff delivered Dr. Grant's letter to Human Resources, Plaintiff received a letter from Superintendent Dr. Kenneth Hamilton ("Hamilton"). (Def.'s 56.1 ¶ 70 (citing Pl.'s Dep. Tr. 95–96; Smith Decl. Ex. R ("Oct. 28, 2015 Hamilton Letter") (Dkt. No. 35-18)).) Hamilton wrote that Plaintiff had sent him a letter on October 14, 2015 and informed Plaintiff that his requests for transfer and paid administrative leave were

denied as unreasonable, but advised Plaintiff that his workspace had been relocated to the alternative rooms. (Oct. 28, 2015 Hamilton Letter.) Plaintiff did not recall sending a letter to Hamilton or requesting paid administrative leave, but thought that if he did, it would have related to mold and flooding in the Band Room, and may have included a request to transfer to a different worksite, although Plaintiff admitted that at the time, he would not have known that it was medically necessary to do so. (Pl.'s Dep. Tr. 97–98, 101–03, 107.)[14] Plaintiff also suggested that the information referenced by Hamilton may have come from Gagne-Kerpiewski and/or Plaintiff's conversation with Silver. (*Id.* at 107.)

After submitting Dr. Grant's letter to the District, Plaintiff believes that he spoke to Kurpiewski about his inability to return to Thornton until all of the remediation efforts were made. (*Id.* at 117.) Plaintiff also thought that he informed Bradley and Morales that he could not return to the building until the situation was remediated. (*Id.* at 118.) Plaintiff did not have any additional meetings with Silver, Bradley, or Human Resources where he reiterated his request to work in a different building, though he thought that he tried to call Silver and Hamilton but was unable to get in touch with them. (Def.'s 56.1 ¶¶ 75–76 (citing Pl.'s Dep. Tr. 119); Pl.'s Dep. Tr. 125.) Plaintiff also did not make any additional building transfer requests, and he did not return to work any time after October 15, 2015. (Def.'s 56.1 ¶¶ 77, 80 (citing Pl.'s Dep. Tr. 123–24, 130).) Plaintiff stated that he did not renew his request to transfer because "[t]here was no reason . . . to do that," and he "would not impress upon somebody to do something for [him] or with [him] regarding a change . . . when it hasn't been resolved as to why

---

[14] The Court does not further address Plaintiff's alleged request for paid administrative leave, as Plaintiff does not recall making this request and has not raised it in his Complaint or his response to the instant Motion.

or what it is." (*Id.* ¶ 74 (citing Pl.'s Dep. Tr. 126).) Plaintiff also did not inform Bradley why he

was not returning to work, because he believed that his attorney would communicate this

information, although he did not know whether his attorney actually did so. (*Id.* ¶¶ 78–79 (citing

Pl.'s Dep. Tr. 130).) Plaintiff agreed that a fundamental element of being a teacher at Thornton

was the "ability to actual[ly] enter the building to teach." (*Id.* ¶ 69 (citing Pl.'s Dep. Tr. 116).)

On January 7, 2016, Plaintiff received a letter from Bradley noting that as of December

30, 2015, he had been absent from Thornton for 44 and a half consecutive days. (Pl. Decl. ¶ 8

(citing *id.* Ex. D ("Jan. 7, 2016 Bradley Letter") (Dkt. No. 37-1)).) Bradley indicated that she

had not received a physician's note from Plaintiff, and instructed him to "produce a sufficient

[physician's] certificate with an indication of anticipated return date . . . in order for the [D]istrict

to plan accordingly for teaching and learning." (Jan. 7, 2016 Bradley Letter.) On February 23,

2016, Plaintiff's attorney sent Bradley a letter noting his "surpris[e]" that the District "ha[d] not

responded in any [way] to [Dr. Grant's] note dated October 23, 2015" and enclosing a copy of

Dr. Grant's letter. (Pl. Decl. ¶ 8 (citing *id.* Ex. E ("Feb. 23, 2016 Powers Letter") (Dkt. No. 37-

1)).)[15] According to Plaintiff, the District "did not give [him] the opportunity to show whether

[he] could . . . work with the accommodation requested by [Dr. Grant]," and was "insisting" that

he return as of January 2016. (*Id.* ¶¶ 8, 11 (citing Jan. 7, 2016 Bradley Letter).) Once Plaintiff's

accumulated sick leave ran out, Bradley "continuously checked to see if [he] had taken up other

work," because if he had, he could lose his benefits from the District. (*Id.* ¶ 11.) According to

Plaintiff, the District "never met [him] or [his] representatives concerning the request for

accommodation from [his] doctor." (*Id.* ¶ 8.)

---

[15] In his letter, counsel for Plaintiff noted that he was responding to a letter from Bradley dated February 4, 2016. (Feb. 23, 2016 Powers Letter.) The February 4, 2016 letter from Bradley does not appear to be part of the record submitted to the Court.

<u>5.  Plaintiff's Worker's Compensation Claim and Resignation</u>

In February 2016, Plaintiff filed a worker's compensation claim (the "Claim"), asserting that he was disabled and unable to work because he was "allergic to the environment" at Thornton's facilities.  (Def.'s 56.1 ¶ 82 (citing Pl.'s Dep. Tr. 130–33; Smith Decl. Ex. S ("Worker's Comp. Claim") (Dkt. No. 35-19)); Worker's Comp. Claim 1.)  Plaintiff wrote that he became ill from exposure to allergens, including the non-removal of standing water and mold in his classroom, and that he suffered from "respiratory illness, loss of voice, fungal arthritis, [and] more complications," including congestive heart failure.  (*Id.*)

On June 22, 2016, Dr. Grant testified at a hearing in relation to Plaintiff's Claim that the building was a "medical risk" to Plaintiff until it was "proven to be free of hazardous molds," that Plaintiff was "very high risk," and that when certain molds were airborne, it would be "a problem."  (Pl.'s Decl. ¶ 9 (citing Grant Hr'g Tr. DEF 297).)  Dr. Grant acknowledged that testing had been done "after the remediation," but further testified that the building had not been tested for "micro toxins" and that "more extensive testing of the air systems" would need to be done; only after such testing was completed would she agree that Plaintiff could return to the building.  (*Id.* ¶ 10 (citing Grant Hr'g Tr. DEF 298–99).)  Dr. Grant would not agree that Plaintiff could return to another portion of the same building that had not been exposed to mold because "[a]ir is air," the "building [wa]s exposed," and "[i]n a sick patient like [Plaintiff], the risk [wa]s too high," but she did state that Plaintiff could return to work in a "clean building." (*Id.* (citing Grant Hr'g Tr. DEF 300); Grant Hr'g Tr. DEF 300.)  With respect to Thornton, Dr. Grant testified that Plaintiff could not return to work, even in a "well-ventilated classroom that did not show any positive findings [of mold]" because "it was more likely probably than not that the air ducts and interior walls [we]re contaminated."  (Def.'s 56.1 ¶ 85 (citing Grant's Hr'g Tr.

DEF 298).)  Dr. Grant opined that after Plaintiff's first visit to her on October 23, 2015, she

thought that the "school was a hazardous environment that would make him progressively

sicker," and that due to Plaintiff's condition, he was "physically unable to work" in general and

was still unable to work at the time of the hearing.  (Grant's Hr'g Tr. DEF 305–06.)  Later in the

hearing, Dr. Grant testified that Plaintiff could do "nontaxing sedentary work in a safe

environment," such as sitting in front of a computer or stuffing envelopes, but testified, "[D]on't

take him away from a table, and don't expose him to anything."  (*Id.* at DEF 307.)  Dr. Grant

attributed this conclusion to Plaintiff's heart condition and respiratory issues.  (Def.'s 56.1 ¶ 89

(citing Grant's Hr'g Tr. DEF 307).)  Dr. Grant stated that Plaintiff also suffers from high blood

pressure, arrhythmias, and a "very fragile heart."  (Grant's Hr'g Tr. DEF 300.)

On July 7, 2016 Plaintiff testified at a hearing related to his Claim that it was his

understanding that as of his last visit with Dr. Grant, he was unable to return to work due to his

physical condition.  (Def.'s 56.1 ¶ 84 (citing Pl.'s Dep. Tr. 135–36; Smith Decl. Ex. T ("Pl.'s

Hr'g Tr."), at DEF 325 (Dkt. No. 35-20)).)  Plaintiff further testified that at the time of his

October 2015 appointment with Dr. Grant, she stated that "given [his] current condition at that

particular time, [he] was not able to work at that time."  (Pl.'s Hr'g Tr. DEF 325.)

Dr. Carl Friedman ("Dr. Friedman"), an independent medical examiner who examined

Plaintiff in June 2016, also testified in connection with Plaintiff's Claim on October 28, 2016.

(Def.'s 56.1 ¶ 90 (citing Smith Decl. Ex. V ("Friedman's Hr'g Tr.") (Dkt. No. 35-22)).)  He

agreed that Plaintiff was "severely disabled" and could not work due to his allergies, asthma,

chronic obstructive pulmonary disease, and stage four congestive heart failure.  (*Id.* (citing

Friedman's Hr'g Tr. DEF 369).)  Freidman confirmed that Plaintiff "developed a systemic

infection of mold, secondary to mold exposure," which was diagnosed with blood and urine tests

and treated with antifungal medications.  (Friedman's Hr'g Tr. DEF 369.)  In response to a

hypothetical question, Dr. Friedman testified that even if Plaintiff did not suffer from cardiac

issues, at most, he could perform "sedentary work."  (Def.'s 56.1 ¶ 91 (citing Friedman's Hr'g

Tr. DEF 370).)

On October 31, 2016, the Worker's Compensation Board disallowed Plaintiff's claim.

The Board found that while Plaintiff could not tolerate mold exposure due to numerous medical

issues, his exposure was no greater at Thornton than it was outside of the building.  (Smith Decl.

Ex. W ("Worker's Comp. Decision") (Dkt. No. 35-23).)  According to Defendant, this finding

"refut[ed] the claim that Plaintiff had contracted an occupational disease arising out of the course

of his employment."  (Def.'s 56.1 ¶ 92 (citing Pl.'s Dep. Tr. 137–38; Worker's Comp.

Decision).)  Plaintiff admits the truth of this statement.  (Pl.'s 56.1 ¶ 92.)

On December 15, 2016, Plaintiff resigned from the District by hand-delivering a letter to

Human Resources which stated that his health was "seriously jeopardized" by the mold condition

at the school.  (Def.'s 56.1 ¶ 93 (citing Pl.'s Dep. Tr. 139; Smith Decl. Ex. X ("Dec. 15, 2016 Pl.

Letter") (Dkt. No. 35-24)).)  After receiving a directive from Human Resources, Plaintiff

resubmitted his letter on January 12, 2017.  (*Id.* ¶ 94 (citing Pl.'s Dep. Tr. 140–42; Smith Decl.

Ex. Y ("Jan. 12, 2017 Pl. Letter") (Dkt. No. 35-25)).)  Plaintiff testified that he thinks he may not

have resigned if the District had conducted the remediation in Dr. Grant's letter.  (Pl.'s Dep. Tr.

143.)  He recalled that in January 2017, he was still in the process of getting better "with the

hope of eventually going back to work," although he thought that he was at an "impasse" with

the District because they had not performed the remediation advised by Dr. Grant.  (*Id.* at 144–

45.)

Effective January 16, 2017, the District accepted Plaintiff's resignation. (Def.'s 56.1 ¶ 95 (citing Pl.'s Dep. Tr. 142; Smith Decl. Ex. Z ("Mar. 1, 2017 Pl. Letter") (Dkt. No. 35-26)).) Plaintiff has not been employed on a full-time basis since he resigned, although he substituted two to three times a week beginning in 2017 and recalled applying to teach at "the Fieldstone Schools." (*Id.* ¶ 96 (citing Pl.'s Dep. Tr. 16–17); Pl.'s Dep. Tr. 19–20, 152–53.) In 2018, Plaintiff officially retired from the District. (*Id.* ¶ 97 (citing Pl.'s Dep. Tr. 16–17).) Between Plaintiff's resignation and his retirement, he did not know whether there was a time where he believed he was physically able to return to full-time teaching. (Pl.'s Dep. Tr. 154.)

B.  Procedural History

On November 6, 2017, Plaintiff filed his Complaint. (*See* Compl.) Defendant filed its Answer on December 7, 2017. (Dkt. No. 7.) The case was automatically referred to mediation, (Dkt. No. 10), and the Parties engaged in a mediation session on February 20, 2018, (Dkt. (entry for Feb. 22, 2018)). On September 17, 2018, the Parties appeared for an initial conference, and the Court adopted a case management schedule. (Dkt. (minute entry for Sept. 17, 2018); Dkt. No. 15.) The case was subsequently referred to Magistrate Judge Judith C. McCarthy ("Judge McCarthy") for general pre-trial on September 28, 2018. (Dkt. No. 16.) Thereafter, the Parties engaged in discovery, receiving several extensions from the Court. (Dkt. Nos. 21, 25, 27.) On August 23, 2019, with leave of the Court, Defendant filed the instant Motion. (Not. of Mot.; Def.'s Mem. in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 33); Def.'s 56.1; Smith Decl.) Plaintiff filed an Opposition on September 20, 2019. (Pl.'s Response in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 38); Pl. Decl.; Pl.'s 56.1.) Defendant filed its Reply on October 11, 2019. (Def.'s Reply.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . ., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc*., 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso*, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted)). Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

B.  Analysis

1.  Failure to Accommodate

Defendant argues that it sufficiently accommodated Plaintiff when it granted two of his requested accommodations, that Plaintiff has not satisfied his evidentiary burden with respect to

his request to transfer, and that at the time of Dr. Grant's recommendations, Plaintiff was unable to work in any capacity. (Def.'s Mem. 7–12.)

### a. Applicable Law

"Discrimination in violation of the ADA includes, inter alia, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)). A "qualified individual" under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also McBride*, 583 F.3d at 96.

Accordingly, an ADA plaintiff can establish a prima facie claim of disability discrimination based on the failure to accommodate a disability by proving the following elements:

> (1) [the] plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [the] plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McMillian v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013) (citation omitted).

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to show "(1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (citation omitted). Plaintiff must plead sufficient facts to raise the inference "that the failure was motivated by discriminatory intent." *Lyman v. City of New York*, No. 01-CV-3789, 2003 WL 22171518, at *6 (S.D.N.Y. Sept. 19, 2003) (citation and quotation marks omitted); *see also Logan v. Matveevskii*, 57 F. Supp. 3d 234, 258 (S.D.N.Y. 2014) ("[A] plaintiff is required to

provide evidence that the delay was motivated by an employer's discriminatory intent, as opposed to mere negligence.").

### b. Dr. Casino Accommodations

With respect to Dr. Casino's recommended accommodations, Defendant argues that Principal Bradley granted each of the requests, and thus, Plaintiff cannot bring a failure to accommodate claim because he has not established that Defendant "refused to make . . . accommodations," *McMillian*, 711 F.3d 120 at 126. (Def.'s Mem. 8–9.) It is undisputed that Plaintiff provided two letters from Dr. Casino to Bradley when they met on October 14, 2015, one of which Plaintiff believes he provided her earlier as well. (Def.'s 56.1 ¶¶ 18, 20 (citing Oct. 22, 2015 Bradley Mem.; Pl.'s Dep. Tr. 50); Pl.'s 56.1 ¶¶ 18, 20.) Dr. Casino recommended that Plaintiff's environment be "cleaned extensively and professionally," or, in the alternative, that Plaintiff be "relocated to an alternative site in the building," and that Plaintiff should use a "partial face mask." (Aug. 31, 2015 Dr. Casino Letter; Oct. 12, 2015 Dr. Casino Letter.) It is also undisputed that Bradley permitted Plaintiff to teach in alternative classrooms "when he felt uncomfortable doing so in his normal classroom," and provided Plaintiff with a schedule identifying those alternative classrooms. (Def.'s 56.1 ¶¶ 21, 23 (citing Pl.'s Dep. Tr. 55, 82–83; Oct. 22, 2015 Bradley Mem.; Oct. 14, 2015 Air Report); Pl.'s 56.1 ¶¶ 21, 23.) Bradley informed Plaintiff that rooms were being "worked on," and air tests were being conducted to determine the presence of mold in the building. (*See* Def.'s 56.1 ¶ 14 (citing Pl.'s Dep. Tr. 36; Oct. 13, 2015 Bradley Email).) At no time did Plaintiff inform Bradley that he was unable to teach in the alternative rooms, and he "did [not] . . . have any basis to say so at the time." (*Id.* ¶ 25; Pl.'s 56.1 ¶ 25; Pl.'s Dep. Tr. 86–89.) Although Plaintiff testified that he was still sick in these classrooms,

and that he continued to cough in at least one of them, Plaintiff does not allege that these rooms suffered from the same visual mold as the Band Room.  (*See* Pl.'s Dep. Tr. 86–91, 113.)

Although not noted in Plaintiff's or Defendant's 56.1 Statement, the record shows that it is also undisputed that Bradley allowed Plaintiff to wear a partial face mask while in the Band Room.  (*Id.* at 65–66.)  Although Plaintiff stated that Bradley did not tell him that he could wear a mask everywhere in the building, he also noted that he did not feel it was necessary to do so, and thus he is not sure whether he asked Bradley if he could keep his mask on throughout the building.  (*Id.* at 67–68.)  Therefore, there is "no genuine dispute that [Defendant] extended [Plaintiff] the accommodation[s] suggested by [Plaintiff's] doctor[] and thereby addressed his documented disability."  *Quadir v. N.Y. State Dep't of Labor*, No. 13-CV-3327, 2016 WL 3633406, at *3 (S.D.N.Y. June 29, 2016), *aff'd*, 691 F. App'x 674 (2d Cir. 2017).  Thus, to the extent that Plaintiff attempts to base a claim of failure to accommodate on Dr. Casino's recommended accommodations—and, from his Complaint and Opposition, it appears he does not—Defendant's Motion is granted.

### c.  Requested Transfer

As with the accommodations proposed by Dr. Casino, Plaintiff does not appear to contend in his Complaint or Opposition that Defendant's denial of his request to transfer *prior* to receiving Dr. Grant's recommendations constituted a failure to accommodate separate from Defendant's failure to respond to Dr. Grant's recommendations.  (*See generally* Compl.; Pl.'s Mem.)  Given that Defendant raises this transfer request in its Memorandum, (Def.'s Mem. 9–12), however, and that Plaintiff describes the request in his Declaration and facts section of his Opposition, (Pl.'s Mem. 4–5; Pl.'s Decl. ¶ 7), the Court addresses it herein.

In mid-October 2015, Plaintiff raised the possibility of transferring to a different building in his meeting with Silver, which took place shortly after his meeting with Bradley. (Def.'s 56.1 ¶¶ 28–29 (citing Pl.'s Dep. Tr. 71–73).) Plaintiff also may have requested a transfer in an October 14, 2018 letter to Hamilton. (Pl.'s Dep. Tr. at 102–03.) Defendant argues that Plaintiff's claim with respect to this request should be dismissed because Plaintiff did not provide medical documentation to support the request, did not present evidence that a transfer was necessary after the two granted accommodations, failed to meet his evidentiary burden with respect to the transfer, and in any event, was unable to return to work in any capacity "almost immediately after" making the request. (Def.'s Mem. 9–12.)

"An ADA plaintiff does not satisfy h[is] burden to identify a potential accommodation merely by reciting the formula that h[is] employer could have reassigned h[im]. Instead, []he must demonstrate the existence, at or around the time when accommodation was sought, of an existing vacant position to which []he could have been reassigned." *McBride*, 583 F.3d at 97–98 (citation omitted). "[T]he position sought must be vacant within a reasonable amount of time," *Shannon v. N.Y. C. Transit Auth.*, 332 F.3d 95, 104 (2d Cir. 2003) (citation omitted), and "an employer need not reassign an employee if no position is vacant. Nor is the employer obliged to create a new position to accommodate the employee," *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999) (citation omitted). Further, although the reasonableness of an employer's accommodation is often a fact question for the jury, "the ADA imposes no liability for an employer's failure to explore alternative accommodations when the accommodations provided to the employee were plainly reasonable." *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 98 (2d Cir. 2015); *see also Wenc v. New London Bd. of Educ.*, No. 14-CV-840, 2016 WL 4410061, at *3 (D. Conn. Aug. 16, 2016) ("[B]ecause the [defendant] complied with [the

plaintiff's doctor's] recommendation, it provided [the plaintiff] with a plainly reasonable accommodation . . . ." (citation omitted)), *aff'd*, 702 F. App'x 27 (2d Cir. 2017).

Here, Plaintiff met with Bradley on October 13, 2015 and provided her with recommendations from Dr. Casino, which she granted during the meeting. In fact, Plaintiff testified that at the time, he "didn't have anything to substantiate [his] intuition of what was happening to [him] until [he] got someone to tell [him] exactly what [his] condition was." (Pl.'s Dep. Tr. 78.) It is further undisputed that at the time Plaintiff asked Silver for a transfer, shortly after his meeting with Bradley, there was no medical evidence contradicting Dr. Casino's recommendations, no medical professional had told Plaintiff that it was necessary for his health to transfer out of the building, and Plaintiff did not inform Silver that a doctor had given him such advice. (*Id.* at 74–75, 77–78, 102–03.) Further, contrary to Plaintiff's contention, Defendant did provide Plaintiff with a reason for its denial of his transfer request—that the requests were unreasonable, and that Defendant had already made arrangements to relocate Plaintiff to different rooms in the building, (*see* Oct. 28, 2015 Hamilton Letter), consistent with Dr. Casino's suggested accommodations. Because at the time of Plaintiff's transfer request, Defendant had complied with Plaintiff's doctor's recommendation, the Court finds that Defendant provided Plaintiff with a "plainly reasonable accommodation," particularly in light of the fact that Plaintiff did not object to Defendant's implementation of Dr. Casino's suggested accommodations, and that Plaintiff provided no additional medical evidence for his transfer request.

While "[i]t is true that the treating physician does not have the final word on determining what is or is not reasonable[,] . . . in a case where there is no medical evidence to the contrary, and the treating physician's opinion does not appear on its face to be outrageous, it is appropriate

for the [c]ourt to give great weight to the physician's opinions as to the nature of the accommodations required for his patient." *D'Amico v. N.Y. State Bd. of Law Exam'rs*, 813 F. Supp. 217, 223 (W.D.N.Y. 1993); *see also Noll*, 787 F.3d at 94 (finding that where the "employer has already taken . . . measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable'" (citation omitted)); *Wenc*, 2016 WL 4410061, at *15 (finding that the defendant reasonably accommodated the plaintiff teacher when it granted "a number of plainly reasonable accommodations . . . on a continuous basis," including a temporary medical leave, which was supported by notes from the plaintiff's doctor, but did not grant the plaintiff's request to transfer to a different grade); *Bielski v. Green*, 674 F. Supp. 2d 414, 425–26 (W.D.N.Y. 2009) (observing that because the defendant's accommodation was "consistent with" the advice of the plaintiff's physician, summary judgment on the plaintiff's reasonable accommodation claim was appropriate).

The Court also notes that Plaintiff attempts to demonstrate that there was a vacancy "at or around" the time of his transfer request by explaining that in April 2015, he applied and was denied an open position at Graham. (Pl. Decl. ¶¶ 4–5.) This was not a request for an accommodation, as Plaintiff testified that he did "not couch[]" his transfer request "in terms of [his] medical condition," (*id.* ¶ 4), and testified in his deposition that he did not inform Bradley that the mold was making him ill until October 2015, (Pl.'s Dep. Tr. 30). However, despite the fact that the music position was available in April 2015, Plaintiff did not request to transfer on the basis of his disability until October 2015. (Def.'s 56.1 ¶¶ 28–29 (citing Pl.'s Dep. Tr. 71–73).) Although the Court is hard-pressed to find a case with similar circumstances, a six-month period between a vacant position and a request to transfer seems lengthy, particularly in light of

*McBride*'s directive that a vacant position must be available "at or around" the time of the requested transfer.  *Cf. Wiechelt v. United Parcel Serv., Inc.*, No. 03-CV-345, 2007 WL 2815755, at *2 (W.D.N.Y. Sept. 24, 2007) (finding that a vacant position existed when the plaintiff showed that one was available "a little more than a month" before the plaintiff was seeking it); *Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 506 (N.D.N.Y. 2004) (determining that there was an issue of fact with respect to the existence of vacant positions when a position was filled one month *after* the plaintiff asked for a transfer).  However, the Court need not determine whether Plaintiff has satisfied his burden of establishing a vacancy, because Defendant's denial of Plaintiff's first transfer request was plainly reasonable, as Defendant had granted two accommodations requested by Plaintiff and Dr. Casino shortly beforehand.

### d.  Dr. Grant Accommodations

According to Defendant, Plaintiff cannot base a failure to reasonably accommodate claim on Dr. Grant's recommendation that Plaintiff avoid returning to Thornton until it was remediated by a "qualified and certified environmental remediator" and "re-evaluated by a certified indoor [e]nvironmentalist . . . [and] [b]oard council [c]ertified [m]icrobial [i]nvestigator," (Oct. 23, 2015 Grant Letter), because it is "undisputed" that at the time Dr. Grant proposed this accommodation, Plaintiff was unable to work "in any capacity," and thus not a qualified individual under the ADA, (Def.'s Mem. 12).  Plaintiff argues that Defendant failed to engage in an interactive process after he made a specific accommodation request, and that he could have performed the essential functions of his job with that accommodation.  (Pl.'s Mem. 7–9.)[16]

---

[16] Plaintiff states that Dr. Grant recommended not only that the environment be remediated and subject to further testing, but also that Plaintiff be transferred to another building. A recommendation of transfer is not apparent from the face of Dr. Grant's letter to Defendant,

Plaintiff's claim that he could have performed the essential functions of his job with Grant's proposed accommodations is belied by his deposition testimony. With respect to returning to work at Thornton, Plaintiff clearly testified that he was not to return until the remediation and testing set forth by Dr. Grant had been performed. For example, Plaintiff agreed that "[u]ntil all the procedures set forth in the letter were done[,] [Plaintiff's] position was [that he] could[] [not] return to teach in the building," that Dr. Grant "delineated . . . what would be compliant for [him] to enter the building to work," and that at one point, Plaintiff informed Bradley and Morales that "per [his] doctor[,] [he] was not to return to the building until the situation had been remediated." (Pl.'s Dep. Tr. 116, 118, 129–30.) However, Plaintiff also testified that at the time he saw Dr. Grant in October 2015, and thus at the same time Defendant received Dr. Grant's letter, Plaintiff was unable to work at all.

> [Q:] [I]in addition to telling you that you couldn't enter the [h]igh [s]chool[,] did Dr. Grant also tell you that you were restricted from working anywhere else?
> [A:] At that time—that given time, yes.
> [Q:] So because of your health condition[,] Dr. Grant told you at that time you couldn't work anywhere; correct?
> [A:] At that time.

(*Id.* at 131–32.) Plaintiff also confirmed that at the time of his Claim in February 2016, it was "still his understanding per Dr. Grant that [he was] unable to work *in any capacity* due to [his] health conditions," (*id.* at 132 (emphasis added)), and that the basis of his worker's compensation claim was that he was "disabled and unable to work," (*id.* at 131.) At one point, although Plaintiff stated that Dr. Grant instructed him that he was disabled and unable to work "[i]n *that particular environment*," Plaintiff also conceded that he could not say that Dr. Grant

---

which stated that Plaintiff should "avoid returning to the school until it has been remediated . . . and then re-evaluated." (Oct. 23, 2015 Grant Letter.) However, the Court's decision with respect to Dr. Grant's remediation and evaluation recommendations would apply equally to a transfer recommendation by Dr. Grant.

informed him "as a direct statement" that he was "able to work in other environments." (*Id.* at

135 (emphasis added).) Indeed, Plaintiff has failed to establish that he was able to perform his

job, even with accommodation, before he began the resignation process in December 2016.

During his deposition, he testified:

> [Q:] If you had prevailed in your Worker's Compensation . . . would you have still
> resigned?
> [A:] I think given the fact that with the amelioration of the problem, if there was a
> concession that there was a problem there in the environment . . . if we could have
> worked out those conditions *and* I could have been well[,] I certainly would have
> tried to work.
>
> . . .
>
> [Q:] At the time you resigned in January 2017[,] was it still your understanding that
> Dr. Grant did not consider you well enough to go back to work?
> [A:] . . . I don't know how to answer that question from a professional point of
> view. I think I have to say that the assessment was being made. She was giving
> me protocols to make me better. I was getting better as time went by . . . . [I]t was
> a very iffy time for me.
> [Q:] In January 2017 . . . do you recall if Dr. Grant had informed you that your
> treatment worked and that you[] [we]re good enough to go back to work at this
> time, or were you still in the process of getting better with the hope of eventually
> going back to work?
> [A:] I think it was with the hope of getting better. But it was very clear to me that
> I was at an impasse with the [s]chool [district] . . . .

(Pl.'s Dep. Tr. 142–45 (emphasis added).) Plaintiff's testimony establishes that even if he had

hoped to return to Thornton with accommodation in late 2016 and early 2017, he could not do so

until he was "better." Indeed, Plaintiff did not begin to work in a part-time substitute position in

a different school district until some time between September and December 2017,

approximately two years after he left Thornton. (*Id.* at 20.) To the extent that Plaintiff sought, or

would have sought, an indefinite period of leave from Thornton until his full recovery, such a

request is impermissible under the ADA, and his testimony that he was unable to work during

the relevant time period "preclud[es him] from establishing a prima facie case of disability

discrimination under the ADA." *Sesay-Harrell v. N.Y.C. Dep't of Homeless Servs.*, No. 12-CV-925, 2013 WL 6244158, at \*17 (S.D.N.Y. Dec. 2, 2013) (collecting cases); *see also Sefovic v. Mem'l Sloan Kettering Cancer Ctr.*, No. 15-CV-5792, 2017 WL 3668845, at \*4–5 (S.D.N.Y. Aug. 23, 2017) (finding the same when the plaintiff testified in a deposition that he had been unable to return to work since he left his workplace); *Ramos-Boyce v. Fordham Univ.*, 419 F. Supp. 2d 469, 473–74 (S.D.N.Y. 2005) (determining that it was undisputed that until the date of her discharge, the plaintiff was unable to do any kind of work because, inter alia, the plaintiff admitted at her deposition that her doctor's notes indicated that she was unable to work).

Even if Plaintiff had been able to work in some capacity during the period before his resignation, Plaintiff has not met his burden of establishing the third step of the prima facie case—that he could perform the essential functions of his position with reasonable accommodations. "'Essential functions' are defined under EEOC regulations to mean the 'fundamental' duties to be performed in the position in question, but not functions that are 'merely marginal.'" *Shannon*, 332 F.3d at 100 (citation omitted); *accord* 29 C.F.R. § 1630.2(n)(1). "A job function may be considered essential for any of several reasons, including but not limited to the following:

> (i) The function may be essential because the reason the position exists is to perform that function;
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).

"In evaluating whether a particular job function is 'essential,' this Court considers" several factors, including "the employer's judgment, written job descriptions, the amount of time

spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions." *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017) (citing 29 C.F.R. § 1630.2(n)(3)), *cert. denied* 138 S. Ct. 359 (2017). Further, "[c]ourts must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." *Id.* (citation and quotation marks omitted). "No one factor is dispositive, and the regulations themselves state that these examples are non-exhaustive." *Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 128 (E.D.N.Y. 2014) (citing *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)); *see also Stevens*, 851 F.3d at 229 (same); *Rodal v. Anesthesia Grp. Of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004) ("[U]ltimately, the question whether a task constitutes an essential function depends on the totality of the circumstances." (citation omitted)).

The record includes few, if any, descriptions of the essential functions of a music teacher at Thornton from Defendant's point of view, other than Bradley's testimony that such teachers were responsible for classes such as music appreciation and music theory. (Bradley Dep. Tr. 9–10.) Plaintiff, however, provides several descriptions of his experience as a music teacher at Thornton, explaining that he taught general music, which included the history of music, music theory, and music appreciation, as well as certain instruments, such as keyboard, guitar, percussion, and brass and woodwind, which he found he more challenging. (Pl.'s Dep. Tr. 9–11.) Plaintiff also explained that he frequently played instruments to show students how to do so, and agreed that it was "fundamental" to his position to be able to "demonstrate and lead by example." (*Id.* at 11.) With respect to the demands of the job, Plaintiff testified that he worked full-time and taught five out of seven instructional periods per day. (*Id.* at 11–12.) It was

"required" that he arrive at school at 7:50 a.m., and he typically stayed until 5:00 or 6:00 p.m., but would sometimes stay as late as 8:00 or 9:00 p.m. if there were after-school performances. (*Id.* at 14.)  Plaintiff agreed that he had "obligations that required [him] to be at school either after school . . .[,] in the evening, or [on] weekends." (*Id.* at 12.)  Although he would sometimes stay later to help teach students instruments without pay, he also stayed after hours for school performances. (*Id.* at 12–13.)  Plaintiff agreed that a fundamental element of teaching was also "the ability to . . . enter the building to teach in the building." (*Id.* at 116.)

Once Plaintiff was cleared to teach as a substitute in late 2017, he testified that although his assignment was to teach a full school day, as he did at Thornton, he could teach only "two[] [or] three days a week based on how well [he] felt or what [he] thought [he] could be strong enough to do." (*Id.* at 20.)  Indeed, Plaintiff confirmed that "[t]here were occasions when [he] was substituting that [he] could not continue or [could] sometimes only work a certain number of days a week," (*id.* at 21), and that "[p]hysically[,] it was very arduous for [him]. . . . [E]ven as a substitute teacher, there were days where [he] could[ not] finish the day," (*id.* at 152–53). Although Plaintiff stated that he "d[id] not know" whether there was a time between his resignation and formal retirement where he believed that he was physically able to return to full-time teaching, he also "th[ought]" that he did not apply for teaching positions during this time because he had been "advised that [he was] not physically or medically able to do so," and because of "[his] state of . . . health being, [he] actually could[] [not]" apply for such jobs. (*Id.* at 153–54.)  Instead, Plaintiff testified that he thought that "maybe [he] could [have taught] college or something like that." (*Id.* at 153.)[17]  Such testimony suggests that even presently, it would be

_____

[17] Plaintiff also testified that although he applied to be a music teacher at the "Fieldstone School" after his retirement, he was not hired for the position. (Pl.'s Dep. Tr. 152.)  He stated, "I think that my health was probably evident on some level that I could[ not] fulfill the rigors of the

difficult for Plaintiff to return to his previous position.  *See Whitfield v. Am. Storage and Transp., Inc.*, No. 12-CV-1622, 2014 WL 204705, at *8 (E.D.N.Y. Jan. 16, 2014) (finding that, based on the plaintiff's deposition testimony, his "physical condition appear[ed] to rule out any reasonable accommodation that could permit him to complete the functions of his old position"), *aff'd*, 588 F. App'x 58 (2d Cir. 2014).

Plaintiff's deposition testimony is supported—and not contradicted by—testimony at his worker's compensation hearings.  During one hearing, Plaintiff testified that Dr. Grant's opinion was that he was "not to be exposed to toxins that had not been remediated in the correct manner inside [Thornton]," and that at the time he saw Dr. Grant, "[s]he stated that given [Plaintiff's] current condition at that particular time, . . . [he] was not able to work at that time."  (Pl.'s Hr'g Tr. DEF 324–25.)  As of Plaintiff's last visit to Dr. Grant before the hearing, she again stated that Plaintiff was "unable to physically return to work[,] . . . because [his] immune system ha[d] been . . . really challenged."  (*Id.*)  Plaintiff's deposition testimony further clarifies that he was "unable to work in any capacity," at the time of his Claim, not just unable to work at Thornton without accommodation.  (Pl.'s Dep. Tr. 131–32.)

As an attempt to raise a dispute of fact, Plaintiff cherry-picks portions of Dr. Grant's testimony in his 56.1 Statement to represent that Dr. Grant told him only that he could not work in Thornton's building.  (*See* Pl.'s 56.1 ¶¶ 68, 81, 83.)  Particularly when read in tandem with Plaintiff's deposition testimony, however, Dr. Grant's testimony does not establish that Plaintiff was qualified to work at Thornton, with or without accommodation, in late October 2015 or at the time of the hearing.  Dr. Grant testified that "until [Thornton] [wa]s proven to be free of

_____

job."  (*Id.*)  It is unclear from Plaintiff's testimony whether this statement is his own assessment of his inability to teach music, or whether it is his speculation as to the reason that he was not hired.

hazardous molds, it[] [was] a medical risk" to Plaintiff, and that if testing for microtoxins and

"more extensive testing of the air systems" were completed, Grant "would be in agreement that

[Plaintiff] could be re-exposed to the building." (Grant's Hr'g Tr. DEF 297–99.) As cited by

Plaintiff, Dr. Grant further stated that Plaintiff could return to work in "another building with no

exposure . . . [a clean building]." (*Id.* at DEF 300.) Plaintiff argues that this testimony

establishes that he would have been able to work at the time of the hearing, as long as he was in a

clean or remediated building. Plaintiff fails to address, however, Dr. Grant's testimony that

Plaintiff was also generally unable to work at the time of the hearing:

> [Q:] [O]utside of the school environment, did you have an opinion as to his ability—his physical ability to work, in relation to your diagnosis and observations?
> [A:] . . . I don't understand the question. . . physical ability to go back to school or to go grocery shopping?
>
> . . .
>
> [Q:] [D]id the claimant have the ability . . . was he able to return to work without restriction at that time, in your opinion?
> [A:] . . . In my opinion, he should not return to that building. . . .
> [Q:] [Y]ou felt the building was harmful to his condition. I'm talking more about his condition. Did the actual condition prevent him from working? Was he physically unable to work, in your opinion?
> [A:] He was—yes.
> [Q:] . . . [F]rom that time in October up until the present day, has that opinion changed?
> [A:] He has responded to therapy, so he's better in many ways but . . . he's a very fragile patient. . . .
> [Q:] So just for clarity, so then it is your opinion that as of now, he is still unable to return to work?
> [A:] Right.

(*Id.* at DEF 305–06.) Dr. Grant later conceded that Plaintiff could do "nontaxing sedentary work

in a safe environment," such as his home, and would be able to sit in front of a computer or stuff

envelopes. (*Id.* at DEF 307.) However, she instructed, "[D]on't take him away from a table, and

don't expose him to anything." (*Id.*) Thus, Dr. Grant's testimony does not create an issue of

fact, and does not suggest that were Thornton to remediate or offer Plaintiff a position at a different school, Plaintiff would be able to return to work in his previous position.[18]

Despite relying on some of Dr. Grant's testimony at the worker's compensation hearing, Plaintiff also argues that testimony from the hearing should not be considered as dispositive, referring to *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999). This case, however, is distinguishable from the one presently before the Court. In *Cleveland*, the Supreme Court vacated summary judgment when the plaintiff had stated in an application to the Social Security Administration ("SSA") that she was "totally disabled" and unable to work but claimed in an ADA case that she could work with reasonable accommodation. *Id.* at 799. The Court found that because there was a "key contextual difference," *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 (2d Cir. 2000), between the two types of cases, the plaintiff was not automatically barred from bringing a case under the ADA and instead should have the opportunity to provide an "explanation of any apparent inconsistency with the necessary elements of an ADA claim," *id.* at 807; *see also Parker*, 204 F.3d at 334–35 (finding that the plaintiff had adequately explained a contradiction between his ADA claim and his SSA application). In *Cleveland* and *Parker*, however, the statements in SSA applications, and not ADA deposition testimony, were at issue, and deposition testimony did not appear to be available to support, and further elaborate on, the testimony given to another adjudicatory body.

---

[18] Further supporting the Court's finding is Dr. Friedman's testimony that Plaintiff was "very severely disabled" with "stage four congestive heart failure" and confirmation that Plaintiff could not work. (Friedman's Hr'g Tr. DEF 369.) When asked whether Plaintiff would be able to work if he suffered from "the problems associated with the mold exposure alone," Dr. Friedman testified, "I'm sure he could do sedentary work. That would be—that's all he can do." (*Id.* at DEF 370.)

Further, notwithstanding Plaintiff's prior testimony and other evidence, Plaintiff now maintains that Defendant is incorrect in asserting that Plaintiff was "unable to perform the functions of the job," and "[b]ecause the [] District never met [Plaintiff] or [his] representatives concerning the request for accommodation from [his] doctor, the question of [his] ability to work in the [] [D]istrict became cloudy." (Pl. Decl. ¶¶ 2, 8; *see also* Pl.'s 56.1 ¶ 81 (stating that Dr. Grant informed Plaintiff only that he could not work in Thornton's building).) These statements "contradict[] [Plaintiff's] prior deposition testimony, and [are] insufficient to create a question of fact." *Needle v. Alling & Cory, Inc.*, 88 F. Supp. 2d 100, 106 (W.D.N.Y. 2000) (collecting cases); *see also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572–73 (2d Cir. 1991) ("The rule is well-settled in th[e] [Second] [C]ircuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior testimony."). Thus, the Court will not consider these statements to create an issue of material fact as to whether Plaintiff would have been able to return to work in a building other than Thornton at the time of his absence.

Because Plaintiff was not a "qualified individual" at the time he provided Defendant with Dr. Grant's recommended accommodations, Defendant cannot be held liable for not engaging in an interactive process with Plaintiff. "[A]n employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA . . . unless [the plaintiff] also establishes that, at least with the aid of some identified accommodation, [he] was qualified for the position at issue." *McBride*, 583 F.3d at 101. Here, Plaintiff has failed to establish that he was qualified for his position at Thornton. Thus, the Court grants Defendant's Motion with respect to Dr. Grant's recommendations and Defendant's engagement in an interactive process with Plaintiff. *See Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 443 (E.D.N.Y. 2009)

("[E]ven assuming . . . that [the] defendants caused the interactive process to fail, that by itself is not enough to defeat [the] defendants' motion for summary judgment . . . [b]ecause [the] plaintiff has not shown that she was qualified for her job . . . even with some accommodation . . . .").

## 2.  Constructive Discharge

Finally, Defendant maintains that Plaintiff "has not identified a single statement or action . . . that suggests a discriminatory animus against him."  (Def.'s Mem. 14–15.)  Plaintiff's claim with respect to his resignation appears to be one for constructive discharge, as he alleges in the Complaint that he was forced to resign from his position due to Defendant's "alter[ation] of the terms and conditions of his employment."  (Compl. ¶ 32.)  "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily."  *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003) (citations omitted).  "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) (citation omitted); *see also Pfizenmayer v. Hicksville Pub. Schs.*, 700 F. App'x 64, 65 (2d Cir. 2017) (same) (citing *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016)).  This "standard is demanding and it will not be satisfied based on difficult or unpleasant working conditions or the plaintiff's preference to no longer work for [his] employer."  *Collazo v. County of Suffolk*, 163 F. Supp. 3d 27, 45 (E.D.N.Y. 2016) (citation and quotation marks omitted); *see also Nicholls v. Philips Semiconductor Mfg.*, 760 F. Supp. 2d 407, 416 (S.D.N.Y. 2011) (noting that the plaintiff's "burden is not an easy one to carry" and "success does not depend upon the plaintiff's subjective beliefs" (citations, alteration, and quotation marks omitted)).

However, because the Parties have not briefed the issue of constructive discharge, and because the Court has already determined that Plaintiff has failed to establish that he is a qualified individual under the ADA, "there is no need to resolve this issue at this juncture." *Petrone v. Hampton Bays Union Free Sch. Dist.*, No. 03-CV-4359, 2013 WL 3491057, at \*27 (E.D.N.Y. July 10, 2013), *aff'd* 568 F. App'x 5 (2d Cir. 2014).

## III. Conclusion

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 32), enter judgment for Defendant, and close this case.

SO ORDERED.

DATED:     March 9 , 2020
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

43